COURT
OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                     FORT
WORTH

 

 

                                           NO.  2-06-144-CR

 

 

REZA VAFAIYAN                                                                 APPELLANT

 

                                                      V.

 

THE STATE OF TEXAS                                                                 STATE

 

                                                  ------------

 

              FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

 

                                                  ------------

 

                                                OPINION

 

                                                  ------------

I.       Introduction








Reza Vafaiyan appeals his conviction and life
sentence for money laundering.  In his
five points, Vafaiyan argues that the trial court erred by failing to grant his
motion to suppress, that the nonaccomplice testimony insufficiently
corroborated the accomplice witness testimony, and that the trial court erred
by omitting three witnesses from the accomplice witness jury instruction.  Vafaiyan also argues that the evidence was
legally and factually insufficient to support his conviction.  We affirm. 

II.      Background and
Procedural Facts

From 2002 to 2004, police investigated Vafaiyan
extensively for his multiple purchases of pseudoephedrine products from various
grocery and drug stores.  Vafaiyan was
suspected of Asmurfing,@ that
is, frequently purchasing small quantities of pseudoephedrine-containing
products from a large number of stores to amass an illegal amount of the
product.  Police suspected that Vafaiyan
would then sell the pseudoephedrine products and other methamphetamine
precursors to customers via clandestine transactions through his store, Krystal
Mart.








During a surveillance of potential smurfing in
the area, several police officers detained Vafaiyan during a traffic stop on
March 22, 2004, and an officer discovered a paper bag in plain view with
pseudoephedrine-containing products inside. 
The officers arrested Vafaiyan during this stop.  On April 23, 2004, police obtained but did
not execute a warrant for Vafaiyan=s arrest
based on an earlier incident regarding his possession of methamphetamine.  From April 25 to April 27, police tailed
Vafaiyan from Wichita Falls to Shreveport and then back and observed him make
several stops at retail stores.  On April
27, police arrested Vafaiyan as he returned home from the trip.  A search of Vafaiyan=s
vehicle resulted in discovery of six cases of starter fluid, twelve cases of
pseudoephedrine products, five eight-packs of lithium batteries, and
$2,100.  Police executed more search
warrants for his house, store, bank accounts, computers, and deposit account in
Atlanta.  The grand jury initially indicted
Vafaiyan for possession of certain chemicals with intent to manufacture
methamphetamine but later re-indicted him for money laundering.

During the trial, police officers, undercover
officers, employees, customers, and convicted methamphetamine cooks testified
against Vafaiyan.  The jury returned a
verdict of guilty and a sentence of life imprisonment, and the trial court
rendered judgment accordingly.  Vafaiyan
appeals this judgment.  III.    The Motion to Suppress

In his first point, Vafaiyan claims the trial
court erred by denying to grant his motion to suppress.  He argues that the evidence in question was
illegally obtained as a result of warrantless searches and searches pursuant to
warrants issued without probable cause. 
We will first consider the two arrests in question, and then we will
examine the seven warrants. 

                                          Standard
of Review













We review a trial court=s ruling
on a motion to suppress evidence under a bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990);  Best v. State,
118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24B25 (Tex.
Crim. App. 2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000), modified on other grounds by State v. Cullen, 195 S.W.3d 696
(Tex. Crim. App. 2006).  Therefore, we
give almost total deference to the trial court=s
rulings on (1) questions of historical fact, even if the trial court=s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application‑of‑law‑to‑fact questions
that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108B09 (Tex.
Crim. App. 2006);  Johnson v. State,
68 S.W.3d 644, 652B53 (Tex. Crim. App. 2002).  But when application-of-law-to-fact questions
do not turn on the credibility and demeanor of the witnesses, we review the
trial court=s rulings on those questions de
novo.  Amador, 221 S.W.3d at 673; Estrada
v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson, 68
S.W.3d at 652‑53.  Stated another
way, when reviewing the trial court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

When the record is silent on the reasons for the
trial court=s ruling, or when there are no
explicit fact findings and neither party timely requested findings and
conclusions from the trial court, we imply the necessary fact findings that
would support the trial court=s ruling
if the evidence, viewed in the light most favorable to the trial court=s
ruling, supports those findings.  Kelly,
204 S.W.3d at 818; see Amador, 221 S.W.3d at 673; Wiede, 214
S.W.3d at 25.  We then review the trial
court=s legal
ruling de novo unless the implied fact findings supported by the record are
also dispositive of the legal ruling.  Kelly,
204 S.W.3d at 819.

We must uphold the trial court=s ruling
if it is supported by the record and correct under any theory of law applicable
to the case even if the trial court gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740  (Tex. Crim. App. 2007); Armendariz
v. State, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 974 (2004).

                                 Traffic
Stop on March 22, 2004








Officer Spragins testified that he and his
colleagues spent the morning of March 22 conducting surveillance on persons
obtaining methamphetamine precursor chemicals, such as pseudoephedrine
products.  The officers were notified by
a Walgreens manager about a suspicious precursor purchase by Vafaiyan, and they
proceeded to follow him to an Albertsons and to another Walgreens.  Officer Spragins testified that he and the
other officers observed Vafaiyan driving erratically, signaling one direction
and then turning the vehicle the other direction.  Officer Spragins stated that Vafaiyan had
already pulled over to the side of the road before they could signal for him to
stop for the traffic violation.  He
confirmed that he and the other officers had detained Vafaiyan upon stepping
out of their vehicles, despite the fact that Vafaiyan had pulled his vehicle
over without official prompting.  Officer
Dilbeck, another officer at the scene, testified that upon approaching the
vehicle, he saw two sacks with two boxes of a pseudoephedrine product in each
sack.  Officer Dilbeck stated that he
asked for consent to search the vehicle and that Vafaiyan verbally gave
consent.  Officer Spragins testified that
they arrested Vafaiyan for possession of certain chemicals with intent to
manufacture a controlled substance.








Under Texas law, a law enforcement officer may
lawfully stop a motorist who commits a traffic violation when the officer has
probable cause to believe a traffic violation has occurred.  Garcia v. State, 827 S.W.2d 937, 944
(Tex. Crim. App. 1992).  Vafaiyan=s
failure to signal a turn constituted a traffic offense.  See Tex. Transp. Code Ann. ' 545.104
(Vernon 1999); Krug v. State, 86 S.W.3d 764, 767 (Tex. App.CEl Paso
2002, pet. ref=d).  Moreover, a peace officer may arrest, without
a warrant, a driver who commits a traffic violation because a violation of the
Texas traffic laws constitutes probable cause to arrest the violator.  See Tex. Transp. Code Ann. ' 543.001
(Vernon 1999); Lemmons v. State, 133 S.W.3d 751, 756 (Tex. App.CFort
Worth 2004, pet. ref=d).  Deferring to the trial court=s
findings, we conclude that the officers=
observations of the traffic violation were sufficient to constitute probable
cause for the stop.

The plain view doctrine supported the police
officers=
subsequent search of the vehicle.  For
this warrant exception to attach, two requirements must be met: (1) the officer
must be in a proper position to view the crime; and (2) the fact that the
officer has discovered evidence must be immediately apparent.  Joseph v. State, 807 S.W.2d 303, 308
(Tex. Crim. App. 1991).  There must be
probable cause to believe the property is associated with some criminal activity.
 Id.  An officer may rely on his own training and
experience to draw inferences and make deductions that might well elude an
untrained person.  U.S. v. Cortez, 449
U.S. 411, 418, 101 S. Ct. 690, 695 (1981).













During this stop, Officer Dilbeck saw the
packages of Sudafed through the car window. 
Officer Dilbeck stated that he knew this type of medication was sought
by methamphetamine cooks.  The officers
involved recalled that they saw Vafaiyan enter three separate retail stores
shortly before the traffic stop on March 22, 2004.  Officers Spragins and Dilbeck testified that
they knew individuals acquired an unlawful amount of pseudoephedrine by
smurfing.  Officer Spragins stated that
he had knowledge of the requirements to arrest someone for possession of
certain chemicals with intent to manufacture methamphetamine.  From this knowledge, he could formulate a
reasonable suspicion that, despite the seemingly innocent act of purchasing
small amounts of cold medicine from a few places, Vafaiyan was engaging in or
about to engage in criminal activity.  See
Woods v. State, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997) (holding that Athere
may be instances when a person=s
conduct viewed in a vacuum, appears purely innocent, yet when viewed in light
of the totality of the circumstances, those actions give rise to reasonable
suspicion@).  Officer Spragins testified that he and the
other officers believed a criminal offense had occurred.  This constitutes the requisite reasonable
suspicion that the Sudafed in Vafaiyan=s
vehicle was associated with a criminal offense.  See West v. State, No. 02-06-00189-CR,
2007 WL 2891108, at *3 (Tex. App.CFort
Worth Oct. 4, 2007, no pet.) (mem. op., not designated for publication)
(holding that the officer=s observation of cocaine-like
substances in plain view in the car during the stop was sufficient to
constitute reasonable suspicion to arrest appellant without a warrant).  Due to evidence of the valid traffic stop and
the precursor chemical in plain view, we agree with the trial court=s ruling
that the officers had probable cause to seize the boxes of Sudafed and to
arrest Vafaiyan.

Moreover, the trial court could have reasonably
concluded from the testimony that Vafaiyan consented to a search of his
car.  When relying on consent to justify
the lawfulness of a search, the State has the burden to prove by clear and
convincing evidence that the appellant=s
consent was freely given.  Gutierrez
v. State, 221 S.W.3d 680, 686 (Tex. Crim. App. 2007).  This burden requires the prosecution to show
the consent was voluntary, and there was no duress or coercion.  Id. 
Whether consent was voluntary is a question of fact to be determined
from the totality of the circumstances.  Id.
at 686B87.

Appellate courts should show almost total
deference to a trial court=s
findings of fact, especially when those findings are based on an evaluation of credibility
and demeanor.  Guzman, 955 S.W.2d
at 89.  If the record supports a finding
of clear and convincing evidence that consent to search was free and voluntary,
a reviewing court may not disturb that finding. 
Johnson v. State, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990), overruled
on other grounds, Heitman v. State, 815 S.W.2d 681, 685 (Tex. Crim. App.
1991).








Here, one officer testified that Vafaiyan
consented to the search, but Vafaiyan stated that he did not give consent.  The trial court had to make a determination
of the facts based on evaluating the credibility and demeanor of persons
involved, and it could have reasonably determined that Vafaiyan consented to
the search based on a showing of clear and convincing evidence.  The trial court was in the best position to
determine the credibility and did in fact make the determination that Vafaiyan
provided consent.

Based on the plain view and consent exceptions to
the warrant requirement, the search and arrest were valid.  We therefore hold that the trial court did
not abuse its discretion by overruling Vafaiyan=s motion
to suppress with regard to the March 22 stop.

                                       Arrest
on April 27, 2004








On April 20, 2004, officers obtained an order to
place a mobile tracking device on Vafaiyan=s
car.  On April 23, 2004, officers
obtained an arrest warrant for Vafaiyan based on an incident from January 12,
2004, when Vafaiyan dropped a packet of methamphetamine in front of a bank
teller.  On April 25, 2004, police
followed Vafaiyan from Wichita Falls to Dallas and then to Shreveport,
Louisiana, where he stayed for two days. 
The officers followed him back on April 27, 2004, observing ten separate
stops at retail stores; they personally observed him purchasing pseudoephedrine
products at three stores.  They
ultimately arrested Vafaiyan on the outstanding warrant when he arrived at his
house.  His arrest was for the
methamphetamine possession from the January incident and, due to the products
seized, also for possession of certain chemicals with intent to manufacture a
controlled substance.  Sergeant Ball
testified that he searched Vafaiyan=s car
incident to the arrest.

Vafaiyan argues this search was conducted in
violation of his Fourth Amendment rights and amounted to another fishing
expedition by law enforcement officials. 
To suppress evidence based on a Fourth Amendment violation, the
defendant bears the initial burden to produce evidence that rebuts the
presumption of proper police conduct.  Amador,
221 S.W. 3d at 672.








A search is per se unreasonable unless it falls
under an exception to the warrant requirement. 
McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim. App.), cert.
denied, 540 U.S. 1004 (2003).  Though
Vafaiyan claims this was an improper inventory search, the search incident to
arrest exception applies in this case.  New
York v. Belton, 453 U.S. 454, 456, 101 S. Ct. 2860, 2862 (1981) (holding
that a police officer may conduct a search of the passenger compartment of an
automobile incident to arrest).  There
must be a lawful arrest for the exception to apply.  Id., 101 S. Ct. at 2862.  Under Belton, when a police officer
has made a lawful custodial arrest of the occupant of the vehicle, the officer
may make a contemporaneous search of the vehicle.  Id., 101 S. Ct. at 2862.  Traditionally, a search following a lawful
custodial arrest is permitted because of the need to remove any weapons that
the arrestee might attempt to use in order to resist arrest or to effect escape
and because of the need to preserve evidence. 
Chimel v. California, 395 U.S. 752, 762B63, 89
S. Ct. 2034, 2040 (1969); Smith v. State, 759 S.W.2d 163, 166 (Tex. App.CHouston
[14th Dist.] 1988, pet. ref=d).  The officer is entitled to search the entire
passenger compartment of the vehicle as the area within the arrestee=s
control.  Belton, 453 U.S. at 460,
101 S. Ct. at 2864.  Courts generally use
this Abright
line@ rule
for the search of an automobile following a lawful arrest, allowing police
officers to search the passenger compartment of the arrestee=s
vehicle if the arrestee was an occupant or recent occupant of the vehicle.  Osban v. State, 726 S.W.2d 107, 111 (Tex.
Crim. App. 1986), overruled on other grounds, Heitman v. State, 815
S.W.2d 681, 690 (Tex. Crim. App. 1991). 
The search is allowed even when the police have handcuffed the arrestee
and placed him in a police car.  See
State v. Garcia, 801 S.W.2d 137, 141 (Tex. App.CSan
Antonio 1990, pet. ref=d).








At this particular detention, the officers
already had an arrest warrant for Vafaiyan and observed him driving home prior
to the actual arrest.  Vafaiyan testified
that he had just locked his car door and had not gotten to his front door at
the time of the arrest.  Compare State
v. Kelly, 963 S.W.2d 866, 870 (Tex. App.CSan
Antonio 1998, no pet.) (holding that when the defendant had been out of his car
for ten to fifteen minutes and physically distanced himself from the car, he
was not a Arecent occupant@ for a Belton-type
search) with Pettigrew v. State, 908 S.W.2d 563, 570 (Tex. App.CFort
Worth 1995, pet. ref=d) (discussing how appellant was
a recent occupant of the vehicle because officers had observed him driving
immediately before arresting him only a few feet from where his vehicle was
parked).  Applying the Abright
line@ rule to
this case, the search of Vafaiyan=s car
was a lawful search incident to arrest because the officers saw him driving and
arrested him while he was still a recent occupant of his vehicle.  See Pettigrew, 908 S.W.2d at 570.  The trial court did not abuse its discretion
by denying the motion to suppress because the record supports the theory that
the search of the vehicle was accomplished incident to Vafaiyan=s arrest
for the January methamphetamine offense.

                                         The
Search Warrants

Vafaiyan argues that the first three search
warrants for his home and the Krystal Mart were invalid because the affidavits did
not provide evidence of an offense or evidence tending to show Vafaiyan
committed an offense.  He argues that the
facts set out in the affidavit were stale when the magistrate issued the search
warrants.  Vafaiyan further argues that
the four search warrants executed after the first three were obtained as a
direct result of evidence seized on execution of the invalid search warrants on
Vafaiyan=s home
and business.








To preserve a complaint for appellate review, a
party must make a timely request, objection, or motion with sufficient
specificity to apprise the trial court of the complaint.  Tex. R. App. P. 33.1(a); Saldano v. State,
70 S.W.3d 873, 886B87 (Tex. Crim. App. 2002).  A motion to suppress is only a specialized
objection to the admissibility of that evidence.  See Galitz v. State, 617 S.W.2d 949,
952 n.10 (Tex. Crim. App. 1981) (op. on reh=g).  The complaint made on appeal must comport
with the complaint made in the trial court or the error is forfeited.  Heidelberg v. State, 144 S.W.3d 535,
537 (Tex. Crim. App. 2004); Bell v. State, 938 S.W.2d 35, 54 (Tex. Crim.
App. 1996), cert. denied, 522 U.S. 827 (1997); Rezac v. State,
782 S.W.2d 869, 870 (Tex. Crim. App. 1990).








In this case, Vafaiyan=s main
argument in the motion to suppress was that the arrest and searches of Vafaiyan=s
person, home, store, accounts, computer, and other effects were Aeffected
without his consent, without valid warrant, or probable cause, or reasonable
suspicion in violation of the Fourth and Fourteenth Amendments.@  Vafaiyan did not argue that the initial
search warrants were issued upon an affidavit containing stale
information.  Because Vafaiyan failed to
preserve error regarding the alleged staleness of information in the search
affidavits, he has waived his staleness complaint.  Tex. R. App. P. 33.1(a)(1)(A); Mosley v.
State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998), cert. denied, 526
U.S. 1070, 119 S. Ct. 1466 (1999) (holding failure to preserve error through
objection at trial); Bell, 938 S.W.2d at 54B55
(same).

Vafaiyan also argues that the facts in the
affidavits were insufficient because many of the recent statements constituted
hearsay from unnamed confidential informants and convicted methamphetamine
cooks with no averments regarding their reliability other than that they were
known criminals and that the information they provided was consistent with
information received from other unnamed sources.








The reviewing court examines the totality of
circumstances to determine if the facts alleged in a probable cause affidavit
sufficiently support a search warrant.  See
Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983).  The allegations in a probable cause affidavit
are sufficient if they would justify a conclusion that the object of the search
is probably on the premises.  Ramos v.
State, 934 S.W.2d 358, 363 (Tex. Crim. App. 1996), cert. denied, 520
U.S. 1198, 117 S. Ct. 1556 (1997).  Only
the facts found within the four corners of the affidavit may be
considered.  Hankins v. State, 132
S.W.3d 380, 388 (Tex. Crim. App.), cert. denied, 543 U.S. 944, 125 S. Ct. 358
(2004).  The magistrate is not required
to find proof beyond a reasonable doubt or by a preponderance of the evidence,
but must only find a probability that contraband or evidence of the crime will
be found in a particular place.  Gates,
462 U.S. at 238, 103 S. Ct. at 2332.  In
ascertaining whether a search warrant is based on probable cause, a warrant
affidavit should be interpreted in a common sense, realistic manner, and the
magistrate is entitled to draw reasonable inferences from the facts contained
therein.  Gibbs v. State, 819
S.W.2d 821, 830 (Tex. Crim. App. 1991), cert. denied, 502 U.S. 1107, 112
S. Ct. 1205 (1992).  Regarding the facts
from an informant in an affidavit, we must analyze what the affidavit reveals
regarding the credibility of the informant, the reliability of the particular
tip, and the basis of the informant=s
knowledge.  See Gates, 462 U.S. at
229, 103 S. Ct. at 2327.

While probable cause may be based upon hearsay,
the hearsay must be credited at each level in order to meet constitutional
requirements.  Hennessy v. State,
660 S.W.2d 87, 91 (Tex. Crim. App. 1983). 
Informant hearsay may be credited by showing that the informant has
given reliable, credible information in the past, or by police corroboration.  Cerda v. State, 846 S.W.2d 533, 535
(Tex. App.CCorpus Christi 1993, no writ);
see also Polanco v. State, 475 S.W.2d 763, 766 (Tex. Crim. App. 1971).  Where an unnamed informant makes a
declaration against penal interest, reliability and credibility may be
established.  Abercrombie v. State,
528 S.W.2d 578, 585 (Tex. Crim. App. 1974).













In this case, Sergeant Ball=s
affidavits contained information obtained from several informants, including
those who purchased precursors from Vafaiyan. 
Four of the informants purchased large amounts of methamphetamine
precursors from Vafaiyan in the past; standing alone, this older information
would not support a finding of probable cause to search.  See Guerra v. State, 860 S.W.2d 609,
611 (Tex. App.CCorpus Christi 1993, pet. ref=d)
(stating that the events delineated in the affidavit must have occurred
sufficiently close enough in time to the request for the warrant to demonstrate
probable cause that the evidence would be found in the suspected place at the
time the warrant was issued).  However,
the other four purchaser-informants were directed by investigators to purchase
large quantities of precursors from Vafaiyan, and they succeeded in doing
so.  There was also noninformant-based
information from store employees, other investigations, and corroboration through
police surveillance.  This  information allowed for the credibility of
the informants to be tested, for the reliability of their particular tips to be
confirmed, and for the basis of the informants=
knowledge to be validated.  See Cascio
v. State, No. 09-06-00311, 2007 WL 2200023, at *2 (Tex. App.CBeaumont
Aug. 1, 2007, pet. ref=d) (mem. op., not designated for
publication) (holding that the informant=s tip
corroborated the conclusion the officer reached from his surveillance).  When considered together with the other
evidence described within the four corners of the affidavits, the totality of
circumstances provided the magistrates with a substantial basis for concluding
probable cause existed to search.

                                                Conclusion

Because of the evidence of proper police conduct
in the March traffic stop, April arrest, and seven search warrants, we conclude
that the trial court did not abuse its discretion by denying Vafaiyan=s motion
to suppress.  We overrule his first
point.

IV.     Corroboration of
Accomplice Testimony

Vafaiyan asserts that the trial court erred by
finding the evidence sufficient despite the presence of uncorroborated
testimony of numerous witnesses who were accomplices as a matter of law.  

                                              Applicable
law








Article 38.14 of the Texas Code of Criminal of
Procedure provides that A[a] conviction cannot be had
upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
2005).  In conducting a sufficiency
review under the accomplice-witness rule, the reviewing court must eliminate
the accomplice testimony from consideration and then examine the remaining
portions of the record to ascertain if there is any evidence that tends to
connect the accused with the commission of the crime.  Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001); Hernandez v. State, 939 S.W.2d 173, 176 (Tex.
Crim. App. 1997).  ATendency
to connect@ rather than rational
sufficiency is the standard: the corroborating evidence need not be sufficient
by itself to establish guilt beyond a reasonable doubt.  Solomon, 49 S.W.3d at 361; Cathey
v. State, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), cert. denied,
528 U.S. 1082 (2000).  Nor is it
necessary for the corroborating evidence to directly link the accused to the
commission of the offense.  Cathey,
992 S.W.2d at 462.  The
accomplice-witness rule is a statutorily-imposed sufficiency review and is not
derived from federal or state constitutional principles that define the legal
and factual sufficiency standards.  Id.
at 462B63.  To satisfy the accomplice-witness rule there
simply needs to be other evidence tending to connect the accused to the
commission of the offense.  See id.
at 463. 

Application 








In this case, the State presented nonaccomplice
testimony that helped establish that Vafaiyan committed money laundering by (1)
purchasing large volumes of pseudoephedrine products and precursors from
multiple sources, (2) selling excessive amounts of pseudoephedrine tablets and
precursors to individuals who manufactured methamphetamine, and (3) knowing
that the money paid to him represented the proceeds of that criminal
activity.  Although several accomplice
witnesses testified about this behavior, including convicted methamphetamine
cooks, this evidence was merely one portion of the evidence presented by the
State. 

Vafaiyan=s
Purchases of Pseudoephedrine Products








The State provided evidence that Vafaiyan
purchased large quantities of Sudafed and Max brand pseudoephedrine
tablets.  A DEA investigator, Dale
Newkirk, testified that he visited Vafaiyan at his store and told him that, as
a retailer, he could only purchase 1,000 grams per calendar month from
distributors and that he could not go from one distributor to another
distributor to buy more pseudoephedrine products.  Despite Vafaiyan=s
assertions to the agent of his minimal volume sales, Sergeant Ball later testified
that, based on dated receipts, Vafaiyan had purchased over $110,000 worth of
pseudoephedrine pills in a twenty-five month period.  The State submitted exhibits containing
invoices from three Dallas wholesalers to Vafaiyan=s store
showing high-volume weekly purchases of pseudoephedrine tablets from each
wholesaler.  The State also presented
nonaccomplice testimony from two Target investigators, a Target loss prevention
officer, and a Walgreens manager who personally saw Vafaiyan make the
suspicious purchases to illustrate that Vafaiyan had made numerous purchases of
pseudoephedrine products from those respective stores.  Investigator Ellsworth testified about
videotapes from separate Targets that showed Vafaiyan=s
alleged smurfing activities.  The loss
prevention officer testified about videotapes showing Vafaiyan=s
purchases of multiple boxes of Sudafed; the videotapes show he made two separate
purchases of the product in a short time period.  Greg Ward stated that about a year and a half
before trial, Vafaiyan purchased two boxes of pseudoephedrine tablets at his
Walgreens store almost every morning. 
Overall the State submitted extensive evidence of Vafaiyan=s
multitudinous purchases of pseudoephedrine products.

Vafaiyan=s Sales
to Methamphetamine Cooks








DEA Investigator Newkirk testified that in June
2001, he notified Vafaiyan at his store about limitations on his customers=
pseudoephedrine purchases.  According to
Newkirk, Vafaiyan confirmed that he was aware of the use of pseudoephedrine in
the illegal manufacture of methamphetamine. 
While Newkirk was informing Vafaiyan of the regulations on
pseudoephedrine tablet sales, Vafaiyan told him that he usually sold only Aone or
two bottles per customer during a single transaction.@  Newkirk testified that he informed Vafaiyan
that as a retail distributor, he could only sell twenty-four grams of
pseudoephedrine per end user.  He
testified that this law changed to a limit of nine grams in October 2001 and
that the notice he gave to Vafaiyan in June stated this change.  Newkirk told Vafaiyan that if he had any
suspicious orders, meaning purchases over the threshold amount or repeated
daily visits for this product, he should call him and let him know.  Newkirk made a second visit to the Krystal
Mart in March 2003 due to suspicious transaction reports from Target.  Vafaiyan testified about this visit and
admitted that by this time he knew that it was unlawful to sell pseudoephedrine
products if he had reasonable cause to believe the person was going to use it
to manufacture a controlled substance.

A Krystal Mart employee and nonaccomplice
witness, Mrs. Stricklan-Smith, testified that she observed Vafaiyan=s sales
of precursors and saw Vafaiyan pack the cold medicine, lithium batteries, and
starter fluid into empty Coke boxes for certain Krystal Mart customers.  Newkirk had previously testified that the
simultaneous purchase of these three items would be absolutely suspicious.  Stricklan-Smith stated that Vafaiyan sold Aten,
twelve boxes of Sudafed at a time@ to
customers.  An undercover officer testified
that she purchased five bottles of pseudoephedrine, two cans of starter fluid,
and sixteen lithium batteries from Vafaiyan. 
Another undercover officer purchased five bottles of pseudoephedrine and
other precursor items from Vafaiyan as well.








Vafaiyan=s
Knowledge that the Money Represented

Proceeds of a Criminal Activity

 

Vafaiyan admitted to Stricklan-Smith that he knew
what the people were doing with the Sudafed, lithium batteries, and other
items.  She testified that he told her
that Ait was
money in his pocket@ and he Awasn=t making
a business selling grocery items out of that store.@  She testified that he told her that when
people came in to buy the items that Amoney
was not to go in the cash register@ because
he had a box below the register. 
Stricklan-Smith testified that Vafaiyan bragged about the amount of
money he was making from selling pseudoephedrine products and other precursors.  








In addition, Vafaiyan sold precursor items and
five bottles of pseudoephedrine tablets at a markup of $17 per bottle to an
undercover officer, Sergeant Douglas.  He
told Douglas that if she was caught with the pseudoephedrine, batteries, and
starter fluid, she would be charged with manufacturing methamphetamine and her
bond would be $100,000.  Douglas
testified that Vafaiyan placed the items in a beer carton and showed her how to
carry it to avoid detection.  She
testified that he did not ring up the purchase on the register but made change
with money from his pocket.  Another
undercover officer, Officer Whisenhunt, testified that during her transaction,
she told Vafaiyan she needed the items for a Abig
cook.@  When she requested more than five bottles,
Vafaiyan told her to just come back later in the day to purchase them.   








Eliminating all of the accomplice testimony from
the methamphetamine cooks and Vafaiyan=s
assistants in buying the precursors, there is sufficient nonaccomplice evidence
to meet the corroboration requirements of article 38.14.  See Tex. Code Crim. Proc. Ann. art.
38.14; Green v. State, 72 S.W.3d 420, 425 (Tex. App.CTexarkana
2002, pet. ref=d) (holding sufficient
nonaccomplice evidence when eyewitness saw appellant committing crime,  and police discovered appellant with
voluminous evidence of illegal drugs and the chemicals necessary for their
manufacture).  Police provided evidence
illustrating Vafaiyan=s awareness of relevant
precursor chemicals for methamphetamine production, officers and store
personnel testified to watching Vafaiyan purchase large amounts of Sudafed, and
Vafaiyan=s
employee testified to the high-volume purchases at the Krystal Mart and to
Vafaiyan=s
admission that he knew why his customers were purchasing these precursors.  The employee provided evidence that the
profits from the precursor purchases went straight to a box under the register,
rather than being rung up.  All of this
testimony tends to connect Vafaiyan to the money laundering offense.  This evidence illustrates that Vafaiyan did
not merely sell certain methamphetamine precursors in legal quantities through
his business, he clandestinely sold marked-up precursor items under the table
and in high volume to known methamphetamine cooks who would pay Vafaiyan=s high prices.  The corroboration requirements of article
38.14 were therefore met in this case. 
Accordingly, we hold that the State presented sufficient nonaccomplice
corroborating evidence to support the other accomplice-related testimony, and
we overrule Vafaiyan=s second point.  

V.     Accomplice Witness
Instruction








In his third point, Vafaiyan argues that the
trial court failed to correctly instruct the jury regarding accomplice witness
testimony pursuant to article 38.141 because three witnesses should have been
listed as accomplices.  The omission of
an accomplice witness instruction is generally harmless unless the
corroborating nonaccomplice evidence is so Aunconvincing
as to render the State=s overall case for conviction
clearly and significantly less persuasive.@  Herron v. State, 86 S.W.3d 621, 632
(Tex. Crim. App. 2002) (citing Saunders v. State, 817 S.W.2d 688, 692
(Tex. Crim. App. 1991)).  In this case,
Vafaiyan argues that three witnesses who accompanied him on road trips were
accomplices as a matter of law.  The witnesses,
Amber Musick, Diane Gwinn, and Troy Vaughn, each separately traveled with
Vafaiyan to various retail stores. 
Vafaiyan did not object to the omission of these witnesses=s names
from the accomplice instruction.

We have already determined that sufficiently
convincing nonaccomplice evidence corroborated the accomplice testimony, and
the analysis did not include or rely on the testimony of these three
individuals.  See Herron, 86
S.W.3d at 63 (holding that the charge error was harmless because nonaccomplice
evidence clearly connected appellant to offense).  Therefore, any error from this omission was
harmless.  See Jones v. State, 195
S.W.3d 279, 292 (Tex. App.CFort
Worth 2006, pet. granted) (op. on reh=g)
(holding that trial court=s omission of accomplice witness
instruction was harmless), aff=d, 235
S.W.3d 783 (Tex. Crim. App. 2007).  We
overrule Vafaiyan=s third point.   

VI.     Legal and Factual
Sufficiency of Evidence for Conviction








Vafaiyan complains that the evidence in this case
was both legally and factually insufficient to show that he knew that the money
he received from others represented the proceeds of a felony activity.[1]  Vafaiyan argues that the evidence presented
did not show that he acquired money in excess of the statutory amount of
$100,000 as the result of criminal activity. 
Vafaiyan argues the evidence shows that he participated in legal
activitiesCthat is, the sale of legal
products through his convenience storeCand that
the evidence is not legally sufficient to support his conviction for money
laundering.

Under the version of Texas Penal Code section
34.02 in effect at the time of the offense, a person committed the offense of
money laundering in the first degree if the person knowingly acquired or
maintained an interest in, concealed, possessed, transferred, or transported
the proceeds of a criminal activity, and the value of the funds was $100,000 or
more.  Act of Sept. 1, 1993, 73rd Leg.,
R.S., ch. 761, ' 2, 1993 Tex. Gen. Laws 2967
(amended 2005) (current version at Tex. Penal Code Ann. ' 34.02
(Vernon 2005)). 

Standard of Review








In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). 
This standard gives full play to the responsibility of the trier of fact
to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789;  Clayton, 235 S.W.3d at
778.  The trier of fact is the sole judge
of the weight and credibility of the evidence. 
See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves
v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the fact-finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.      








In a factual sufficiency review, we view all the
evidence in a neutral light, favoring neither party.  Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex.
Crim. App. 2005).  We then ask whether
the evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s determination is manifestly
unjust.  Watson, 204 S.W.3d at 414B15, 417;
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, we must give due deference to the
fact-finder=s determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003). 

Analysis








The jury heard manifold evidence tending to show
that Vafaiyan knowingly acquired proceeds from a criminal activity by selling
methamphetamine precursors to methamphetamine cooks.  The State presented testimony from four
methamphetamine cooks who were well acquainted with Vafaiyan=s
transactions through their habitual purchases of bulk precursor materials from
the Krystal Mart.  One cook, Sheer, stated that he
even traded methamphetamine for pseudoephedrine tablets in a few of his
transactions with Vafaiyan.  Another
cook, Alexander, stated that he would spend, in cash, between $2,000 and $7,000
per transaction with Vafaiyan.  He stated
that Vafaiyan would calculate the necessary quantity of batteries and starter
fluid to go along with his pseudoephedrine tablet order and would carefully
package the precursors in cardboard boxes for him.  Alexander testified that Vafaiyan had joked
with him and another cook one day, declaring that he was just standing outside
talking to the Atwo biggest methamphetamine
cooks in Wichita Falls.@ 
In addition, another cook, Horton, stated that he gave Vafaiyan $2,000
to $3,000 to drive to Dallas to buy pseudoephedrine pills and that Vafaiyan
brought the pills back for him.  Horton
stated that he cooked methamphetamine seven or eight times a month and shopped
at Vafaiyan=s store because he could buy all
of the items he needed at one time. 
Shaffer was the last methamphetamine cook to testify; he stated that he
would purchase pseudoephedrine and other precursors every other day at the
Krystal Mart and would pay Vafaiyan $1,500 in cash.  Vafaiyan stated he had never met one of the
methamphetamine cooks who testified at trial, but he did admit that he Acut off@ sales
of Sudafed to Alexander, Shaffer, and Horton.  









The methamphetamine cook testimony tending to
show Vafaiyan=s knowledge of the
methamphetamine proceeds was corroborated by testimony from the former employee
who witnessed the purchases and from the undercover officers who purchased
precursors from him.  The State
emphasized Vafaiyan=s knowledge with former employee
Stricklan-Smith=s testimony that Vafaiyan told
her that he knew what the customers were buying the items for.  As previously mentioned, Vafaiyan directed
her not to place money from those transactions into the store=s cash
register.  Vafaiyan also admitted to
Stricklan-Smith that he knew he was supposed to report those types of sales to
the authorities.  

The State also offered evidence that Vafaiyan had
knowledge of the illegal activity with Officer Douglas=s
testimony that Vafaiyan had warned her if she was caught with all of the
precursors he sold to her, she would be charged with the crime of intent to
manufacture methamphetamine.  

To show that Vafaiyan had the requisite knowledge
that his transactions were from the proceeds of an illegal activity, the State
also offered evidence regarding police finding large quantities of paper money
in Vafaiyan=s car, home, store, and safety
deposit boxes.  Aside from the evidence
from methamphetamine cooks admitting to spending thousands of dollars per week
for precursor items at the Krystal Mart, the State offered evidence from the
employee who stated that Vafaiyan had admitted to her that he was not Amaking a
business selling grocery items out of that store.@   








When questioned by the State, Vafaiyan gave
dubious explanations for the high volume of cash found in his safety deposit
box, home, and store.  When asked about
the $200,000 found in his safety deposit box in Texas, Vafaiyan stated he had
received $33,000 from insurance and $50,000 for storm damages to his rent houses.  Vafaiyan stated he had received the $88,700
found in his safety deposit box in Atlanta from customer donations and the
depletion of his gas tanks.  Vafaiyan
explained the $128,000 in his store safe by stating it was money he had
accumulated since he opened the Krystal Mart. 
When asked about $57,000 found in the trash can at the Krystal Mart,
Vafaiyan stated it was from store sales and from a loan that AMr.
Assadpor@ had paid
back to him.   

The State presented evidence that Vafaiyan=s wallet
contained a credit card with the name of Hossin Assadpor and that this
individual=s credit card statements were
billed to Vafaiyan=s address.  The State argued that this money actually
came from selling pills to methamphetamine cooks.   The State provided banking records and
methamphetamine cook testimony about their cash transactions to illustrate its
theory that Vafaiyan accumulated the large sums from precursor sales rather
than from legitimate sales, insurance proceeds, and customer donations. 

From the foregoing evidence, a jury could have
reasonably concluded that Vafaiyan knew that he was selling large quantities of
methamphetamine precursors to methamphetamine cooks who paid for the precursors
with money from the sale of methamphetamine. 
Considering the evidence in the light most favorable to the prosecution,
we hold that it was legally sufficient to show that Vafaiyan knowingly acquired
funds of $100,000 or more from a criminal activity.  See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789.  








Considering the evidence in a neutral light, we
cannot say the jury=s verdict was clearly wrong,
manifestly unjust, or that the conflicting evidence greatly outweighed the
evidence supporting the conviction.  See
Watson, 204 S.W.3d at 414B15.  Thus, the evidence was factually
sufficient.  See id.  We therefore overrule Vafaiyan=s fourth
and fifth points. 

VII.    Conclusion

Having overruled Vafaiyan=s five points, we affirm the
trial court=s judgment.

 

ANNE GARDNER

JUSTICE

 

PANEL: GARDNER, WALKER, and MCCOY,
JJ.

 

PUBLISH

 

DELIVERED:  December 18, 2008











[1]Vafaiyan argues in his
fourth point that despite the indictment=s failure to charge Vafaiyan under the law of the
parties, he will apply it to this case. 
He emphasizes that he was not involved in the illegal activity of
manufacturing methamphetamine, but that the State sought to convict him of
aiding in the illegal activities of others. 
He argues that the State did not provide sufficient evidence of the
knowledge element of the money laundering, namely that he possessed knowledge that
the money received was the proceeds of a felony activity.  Because this point is linked to the legal and
factual sufficiency analysis, we will not address its merits separately.